WILLIAM C. HAY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 106801.    Promulgated July 23, 1943.

*Joseph D. Brady, Esq.*, and *A. J. Hair, Esq.*, for the petitioner.

*B. H. Neblett, Esq., Samuel Taylor, Esq.*, and *Alva C. Baird, Esq.*, for the respondent.

# 466

OPINION.

ARUNDELL, *Judge:* We accept the premise, as does the Commissioner in his brief, that petitioner was a nonresident alien of the United States from and after June 17, 1937. About this we think there can be no doubt, for section 800 of Title 8 of the United States Code Annotated [1] proclaims the natural and inherent right of all people to expatriate themselves and that "any declaration, instruction, opinion, order, or decision of any officer of the United States which denies, restricts, impairs, or questions the right of expatriation, is declared inconsistent with the fundamental principles of the Republic." A national of the United States, whether by birth or naturalization, loses his nationality by obtaining naturalization in a foreign state or by taking an oath of allegiance to a foreign state. *Ibid*, sec. 801. See *Reynolds* v. *Haskins*, 8 Fed. (2d) 473. Petitioner did both of these things on June 17, 1937. The record furnishes adequate proof that Hay's repatriation as a British subject was in conformity with the laws of Canada, that it was real and bona fide, and that in the succeeding years he has remained a nonresident alien of this country.

Accordingly, petitioner is taxable as a citizen of the United States for the period to June 17, 1937, and from that date until the end of the taxable year he is to be taxed as a nonresident alien. *John C. Lee*, 6 B. T. A. 1005; G. C. M. 9064, C. B. X-1, p. 314; G. C. M. 10759, C. B. XI-2, p. 99. We are concerned here only with what transpired after June 17, 1937.

A nonresident alien is taxable under subsections (a) or (b) of section 211, Revenue Act of 1936, depending upon whether or not he is engaged in trade or business or has an office or place of business in the United States. In the present case petitioner expressly waives

---

[1] Section 800. Right of Expatriation.

Whereas the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness; and whereas in the recognition of this principle this Government has freely received emigrants from all nations, and invested them with the rights of citizenship; and whereas it is claimed that such American citizens, with their descendants, are subjects of foreign states, owing allegiance to the governments thereof; and whereas it is necessary to the maintenance of public peace that this claim of foreign allegiance should be promptly and finally disavowed: Therefore any declaration, instruction, opinion, order, or decision of any officer of the United States which denies, restricts, impairs, or questions the right of expatriation, is declared inconsistent with the fundamental principles of the Republic.

any reliance upon subsection (a), so that we need not inquire whether the particular type of income dealt with therein (fixed or determinable annual or periodical gains) has been realized here. Under subsection (b), which concededly governs, the gross income of a nonresident alien is substantially the same as a resident or a citizen of this country, subject, however, to the qualification of section 212 (a), that the gross income of a nonresident alien individual "includes only the gross income from sources within the United States."

The facts are briefly as follows: Petitioner, with the prime object of escaping death duties in the United States, decided to resume his Canadian citizenship and remove his property from this country. The bulk of his wealth consisted of shares in a wholly owned California corporation, and, since this was a peculiar type of property upon which his estate would have been taxed even if he died a nonresident alien and the certificates were outside the jurisdiction of the United States (Internal Revenue Code, sec. 862 (a)), it was essential that he rid himself of such shares. Probably the most direct method of doing this would have been to liquidate the domestic corporation, but obviously this would have produced a large income tax; as a consequence, upon advice of tax counsel, petitioner determined to accomplish the purpose by transferring the shares to a wholly owned foreign corporation which eventually would liquidate the California company. There is some testimony, and counsel for petitioner strongly urges, that the decision to liquidate Hay, Ltd., was a matter entirely unrelated to the original exchange of Hay, Ltd., shares for Colonial's stock. Petitioner frankly admitted on the stand, however, that at the time the whole plan was conceived it was his idea to have the Colonial company eventually liquidate Hay, Ltd. We do not know precisely what petitioner meant by the word "eventually," but he expressed an apprehension that until such liquidation had taken place there was a possibility of his being subject to estate taxes in two different countries upon the same basic assets. We may accept the testimony that proposals for the taxation of personal holding company surpluses were the immediate cause resulting in the liquidation of Hay, Ltd., at the particular time of December of the tax year; but this does not militate against our conclusion that the liquidation was part of a preconceived plan to carry out petitioner's primary purpose. In our opinion no other conclusion would be justified upon the present record.

Pursuant to the arrangements petitioner became a nonresident alien, created a Bahamas corporation, transferred to it in Nassau all of his Hay, Ltd., shares in exchange for its stock, and caused the liquidation of Hay, Ltd., some four months later. The Bahamas corporation received the assets distributed in liquidation and so far as appears continues to hold them.

The gain on the original exchange of August 6, viewed as a separate transaction, would have been taxable to petitioner under the provisions of section 112 (i)[2] were it not for the fact that the exchange took place outside the United States. In defining income from sources within and without the United States, section 119 (f) requires that an exchange be treated the same as a sale, and subsection (e) prescribes that gain resulting from the purchase of personal property within and its sale without the United States shall be treated as having been derived entirely from sources within the country in which the sale takes place. Inasmuch as the present exchange took place in a foreign country, the gain was derived from sources without the United States and is not taxable to petitioner, a nonresident alien. Sec. 212 (a), *supra.*

Respondent presents an argument that the exchange should be regarded as having taken place in the United States on the ground that petitioner, while in this country, conceived the idea of creating Colonial and of exchanging for its stock the shares he held in Hay, Ltd. The only authority cited for this suggestion is the concurring opinion in *Kaspare Cohn Co., Ltd.*, 35 B. T. A. 646, 671. To sustain respondent's suggestion in the present circumstances would be to create a taxable event out of what took place in the mind of an individual. There was no contract, agreement, or commitment made by petitioner with anyone in this country with respect to the exchange of his Hay, Ltd., stock, which serves adequately to distinguish the *Cohn* case. That he intended to exchange it with a corporation to be, but not yet formed, can not, in our view, serve to waive the requirement that an event—something other than subtle mental processes—is required to produce tax liabilities.

We do not understand that respondent presses the above contention very zealously. His principal argument, and to this most of his brief is directed, is that the Colonial company had no purpose other than the furtherance of tax avoidance; that its existence should, therefore, be disregarded and the liquidation of Hay, Ltd., in December 1937, should be deemed to have been made to petitioner personally. Respondent cites some 11 cases dealing with disregard of corporate personality in varying settings of sham or unreality, among them *Gregory* v. *Helvering*, 293 U. S. 465; *Griffiths* v. *Commissioner*, 308 U. S. 355; *Higgins* v. *Smith*, 308 U. S. 473; *Electrical Securities Corporation* v. *Commissioner*, 92 Fed. (2d) 593; and *Paul Plunkett &*

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

\* \* \* \* \* \* \*

(i) FOREIGN CORPORATIONS.—In determining the extent to which gain shall be recognized in the case of any of the exchanges (made after the date of the enactment of this Act) described in subsection (b) (3), (4), (5), or (6), or described in so much of subsection (c) as refers to subsection (b) (3) or (5), or described in subsection (d), a foreign corporation shall not be considered as a corporation unless, prior to such exchange, it has been established to the satisfaction of the Commissioner that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

*Co.*, 42 B. T. A. 464. Further light has recently been shed on the general problem by the Supreme Court in *Moline Properties, Inc.* v. *Commissioner*, 319 U. S. 436.

We agree with respondent. Petitioner in effect liquidated a domestic corporation, thereby realizing a large profit. We know of no valid reason upon which to excuse him from tax thereon. As we have said, it was necessary for petitioner's purpose to liquidate the company so that ownership of its assets could be removed from the United States. A suggestion is made that petitioner's purpose could have been achieved as readily by a sale of the Hay, Ltd., stock, which, had it occurred in Canada, would have produced no tax liability for petitioner. This is beside the point. For reasons satisfactory to himself he did not make a sale and we need not concern ourselves with what the case would have been if he had. He intended at the outset to have Hay, Ltd., liquidate. That is what actually occurred and is, of course, what must govern here.

If petitioner had directly liquidated his company a large income tax would have been payable. To avoid that circumstance the Bahamas corporation was organized and, after exchanging its stock for Hay, Ltd., stock, petitioner caused the liquidation of Hay, Ltd. As the new owner of its stock, the Bahamas corporation received the liquidating distribution. It is true that the complete scheme of circuitous tax avoidance is not present, in that the Bahamas corporation did not immediately turn around and distribute the assets to petitioner in its own liquidation. If that appeared the case would have been clearer. But as a matter of law we do not see that it makes any difference in the present circumstances. In so far as dominion and control were concerned, it made not a particle of difference whether the liquidation was to Hay individually or to his wholly owned foreign corporation. "And it makes no difference that such 'command' may be exercised through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency." *Griffiths* v. *Commissioner, supra. Higgins* v. *Smith, supra*, is distinguished in petitioner's brief upon the ground that it involved a claimed loss deduction, and in this connection the supplemental opinion in *John Thomas Smith*, 42 B. T. A. 505, was cited. The attempted ground of distinction disappears, however, in the Second Circuit's reversal, *Commissioner* v. *Smith*, 136 Fed. (2d) 556. Equally applicable here is the latter court's statement:

It seems unnecessary to say whether the income of a corporation that is wholly owned by a single stockholder should invariably be taxed as his own. * * * But in the case at bar we need go no farther than to say that there was no substantial business reason for the creation or continued existence of Innisfail since its only, or at least, its main object was to furnish the owner of

all its stock with a means of diminishing his taxes. It not only conducted no business enterprise, but had no justification for existence even as a holding company. * * *

We have searched the present record for reasons, other than tax, to justify Colonial's organization or continuance, but they do not appear. Petitioner's counsel assert that it is common practice for people of wealth to put that wealth in corporate form, and reference is made to *Chisholm* v. *Commissioner*, 79 Fed. (2d) 14, 16. But that it is common practice or a personal convenience is not enough. The Supreme Court, in *Moline Properties, Inc.* v. *Commissioner, supra*, stated the all important additional requirement: If the purpose is "to serve the creator's personal or undisclosed convenience, *so long as that purpose is the equivalent of business activity or is followed by the carrying on of a business by the corporation*, the corporation remains a separate taxable entity." (Emphasis added.) We have found that the main object in creating Colonial was to minimize taxation, and such a purpose obviously is not the equivalent of business activity. *Electrical Securities Corporation* v. *Commissioner, supra*. And there can be no doubt that its creation was not followed by the carrying on of business. Petitioner's counsel ask the question, "If Colonial's *holding* $2,000,000 in cash for five years—awaiting a favorable opportunity to put it to work earning a return and with a minimum of risk—is not a business activity, then what is it?" It is perhaps enough to say only that it is not a business activity as that term is usually applied to corporate enterprises.

Petitioner objects that, in any event, a distribution in complete liquidation is treated by section 115 (c) as an exchange; the liquidating exchange in this instance took place in Nassau and, consequently, the gain, being derived from sources without the United States. is not taxable to a nonresident alien. Sec. 119 (e), *supra*. While we have found no authority directly in point and none has been cited by either party, we think the fallacy of this reasoning lies in the fact that a liquidation in reality is not a sale or exchange requiring the concurrence of two parties, but is essentially the unilateral act of the corporation. This point is illustrated by the fact that a corporation may make a distribution in complete liquidation notwithstanding the shareholders continue to hold their stock certificates. *Frelmort Realty Corporation*, 29 B. T. A. 181, 189. Liquidation of a corporation is defined as "the operation of winding up its affairs by realizing its assets, paying its debts and appropriating the amount of profit or loss." *W. E. Guild*, 19 B. T. A. 1186. It is in contemplation of law a strictly corporate act, not of any agent or officer who fortuitously executes its mechanics, but of the corporate entity itself, which, of course, has existence only in the place of its. creation.

*Bank of Augusta* v. *Earle*, 13 Pet. 519, 588. In this instance that place was California; and it can not be doubted from a practical standpoint that petitioner's gain from the liquidation of a California corporation, which so far as appears had conducted all its business in the United States, was derived from sources within this country. Cf. *Bence* v. *United States*, 18 Fed. Supp. 848, 854: "If it be assumed that the amounts received by plaintiff during the years in question were not dividends * * *, they were, nevertheless, taxable to her as income from sources within the United States since such amounts were paid on stock of a corporation doing business in the United States and were, therefore, derived from sources within the United States." Dividends distributed by a domestic corporation earning its income in this country are income from sources within the United States. Sec. 119 (a) (2). In so far as the source is concerned, we can see no difference between an ordinary dividend and a liquidating dividend. True it is that for purposes of computing gain or loss upon a complete liquidation the amount distributed is "treated as in full payment in exchange for the stock." Sec. 115 (c). This is because the liquidation marks a closed transaction and affords an opportunity for the stockholder to strike a balance with respect to his investment. In this respect a liquidation takes on some of the aspects of a sale or exchange, but it also contains some of the elements of an ordinary dividend. S. Rept. 558, p. 37; H. Rept. 704, p. 29, 73d Cong., 2d sess. Section 115 (c) does not provide that a liquidating distribution *is* an exchange; it does not convert what is in fact a unilateral act into a biparty transaction; nor does it say that it shall be so treated in determining the source of income under section 119. The latter section deals with transactions that are in fact sales or exchanges; and a sale or exchange does not embrace what basically is a unilateral act of a corporation.

Consequently, we can not subscribe to the anomaly of holding that the gain upon liquidation of an American corporation, having done all its business in the United States, is a gain from sources without this country, based only upon the fact that a technical bill of sale was executed across the border. "* * * the fact that the perfunctory transfers occurred in Canada is entitled to no weight." *Georday Enterprises, Ltd.* v. *Commissioner*, 126 Fed. (2d) 384. "Plainly, the payment in question constitutes income derived from a source within the United States; and the natural aim of Congress would be to reach it." *Helvering* v. *Stockholms Enskilda Bank*, 293 U. S. 84. We conclude, therefore, that petitioner derived gain from sources within the United States upon the liquidation of Hay, Ltd., a California corporation.

A subsidiary matter that requires consideration results from the contention of petitioner's counsel that the only issue properly raised

by the pleadings is whether petitioner is taxable upon the August 6, 1937, exchange, and that consideration of the liquidation of Hay, Ltd., in December 1937 is beyond the scope of the pleadings. We are not impressed by the contention, and evidence was admitted regarding the entire transaction. There is nothing to support petitioner's view in the statutory notice of deficiency. That document advised petitioner of the Commissioner's determination that he had realized gain of $2,459,083 upon the disposition of Hay, Ltd., stock and that 30 percent thereof was taxable under the provisions of sections 112 and 117. That determination was squarely put in issue by paragraph 4 (a) of the petition, which alleged only that: "The Commissioner has erroneously included in the gross income of the petitioner for the calendar year the amount of $737,724.90, alleged by the Commissioner to constitute a taxable capital gain but which gain, if any, in fact, arose or was realized from the sale or exchange of securities outside the United States by the petitioner, a nonresident alien." Thus, nothing was said in either the deficiency notice or the assignment of error as to the date on which the disposition was made. Petitioner did not put in issue the cost or other basis of the shares, the amount realized upon the disposition, or the amount of the gain realized. The issue upon which we were asked to pass was whether the respondent erred in determining that petitioner had disposed of his shares in Hay, Ltd., during the taxable year and had realized a taxable gain therefrom. Upon the issue so framed our opinion is set forth herein. It is true that petitioner's prayer requested this Court to find that the sale or exchange "on August 6, 1937" did not result in a profit taxable to petitioner. We think, however, that a taxpayer's prayer may not be used to limit the issue or place upon the Commissioner the duty of alleging facts, with the consequent burden of proving them, which fairly are within the scope of the issue raised by the deficiency notice and assignment of error. To resolve the issue presented necessarily required a consideration of all the happenings. Petitioner had disposed of his stock in a manner that he well knew would bring the closest scrutiny. Having in mind the form of the deficiency notice, we think it was entirely competent for the Commissioner to argue that, viewing all that took place in the tax year, the crux of what happened was that petitioner individually disposed of his Hay, Ltd., stock when that company, within the tax year, completely liquidated. This was not raising a new issue, but merely advancing a reason or ground for his action. *Irish* v. *Commissioner*, 129 Fed. (2d) 468. The Commissioner assigned no explicit reason for his action in the notice of deficiency, but, even if he had, "The Board has said many times that the real question for decision is the correctness of the action of the Commissioner

and not the correctness of the reason which he assigned in his notice of deficiency." *Raoul H. Fleischmann*, 40 B. T. A. 672, 682.

The petitioner relies heavily upon what appears in the revenue agent's report. Attention was there focused upon the Agent 6 exchange, and petitioner asserts that the Commissioner in determining the present deficiency must have proceeded upon that basis. This was explicitly denied by respondent's counsel during the trial. The agent stated in his report that petitioner had expatriated himself on June 17, 1937, and was at that time a resident of Canada. It was further stated that the sale of Hay, Ltd., stock took place in Nassau on August 6, 1937. Thus, petitioner argues that the Commissioner determined a tax liability upon the sale of property by a nonresident alien outside the United States. Plainly there would be no tax liability on that premise and we can not presume the Commissioner made such a futile determination. The Commissioner ordinarily will be presumed to have had some rational basis for his action. Petitioner recognizes this, but suggests that in making his determination the Commissioner failed to adopt the agent's conclusion that Hay had succeeded in expatriating himself. This, of course, is pure surmise; and if we are to indulge in speculation we think the assumption can as fairly be made that the Commissioner determined a tax from the entire transaction and purposely refrained from tying his determination down to any particular date or to either step in the related transaction. In *Henry Tilson*, 16 B. T. A. 1280, 1285–1286, we said:

\* \* \* Such an assumption [that adjustments in the revenue agent's report have been carried into the Commissioner's ultimate computation of the deficiencies] we believe would be unjustified even in cases where the revenue agent in his report proposed a deficiency which coincides in amount with the deficiency determined by the Commissioner. This is so for several reasons, one of which would be that the revenue agent might make a proper adjustment but assign an improper reason therefor, and if the Commissioner should adopt the adjustment but assign a proper reason therefor, the taxpayer would merely be knocking down his own straw man if he confined his allegation of error and his proof to the adjustment and explanation contained in the revenue agent's report. \* \* \*

The purpose of the deficiency notice is to advise taxpayers of proposed increases in tax and give them adequate notice of what prompted the increases. The notice in the present case served that purpose well. Petitioner's counsel can not claim surprise, for it is admitted that counsel for respondent, in a conference some six weeks before the trial of the cause, advised petitioner's counsel that such an argument would be presented, and petitioner's counsel has fully and ably argued it on reply brief.

Reviewed by the Court.

*Decision will be entered under Rule 50.*